## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| GARY HARDEN | ) | |
| | ) | CIVIL ACTION FILE NO. |
| Plaintiff, | ) | 5:12-cv-80 |
| | ) | |
| v. | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| ARCILLA MINING & LAND, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, Plaintiff Gary Harden, by and through undersigned counsel, and hereby brings this action against Defendant Arcilla Mining & Land, LLC.

## NATURE OF THE ACTION

1.     This is an action under 42 U.S.C. Section 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, alleging that Defendant (1) discriminated against Plaintiff on account of his race in violation of Section 1981 and Title VII; (2) discriminated against Plaintiff with regard to his wages on account of his race in violation of Section 1981 and Title VII; (3) retaliated against Plaintiff for actions protected under Section 1981, Title VII, and the FLSA; and (4) failed to pay Plaintiff the correct amount of overtime wages.

1

## PARTIES

2.      Plaintiff is an African-American male of more than nineteen years of age and a resident of Baldwin County, Georgia.

3.      Defendant is a Georgia Limited Liability Corporation with its principal office located in Wilkinson County at 9474 Highway 57, McIntire, Georgia 31054.   According to the Georgia Secretary of State, Defendant's registered agent is Ted S. Smith, whose office address is the same as the principal address of company.   However, Defendant may be served with process by delivering a copy of the complaint and a summons to its attorney Ted Boehm at 1075 Peachtree Street, NE, Suite 3500, Atlanta, Georgia 30309 because Defendant has authorized Mr. Boehme to accept service on its behalf.

## JURISDICTION AND VENUE

4.      The district court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (Title VII).

5.      Defendant is subject to personal jurisdiction in the State of Georgia for purposes of this lawsuit because it has sufficient minimum contacts with the forum state, including, but not limited to: its possession of assets in Georgia, its maintenance of business and employment relationships in Georgia, its formation of

contracts in Georgia with Georgia residents, and its registration to do business in Georgia with the Georgia Secretary of State.

6.     Defendant is an employer covered by the FLSA because (1) it is an employer engaged in interstate commerce, (2) its employees (including Plaintiff) are engaged in interstate commerce, and (3) it has at least $500,000 in "annual gross volume of sales made or business done." 29 U.S.C. § 203(s)(1)(A).

7.     Defendant is an "employer" within the meaning of Section 1981 and Title VII because it employed at least 15 persons at all times relevant to this action.

8.     Pursuant to 28 U.S.C. § 1391(b)(1) and Local Rule 3.4, Defendant is subject to venue in the Macon Division of the Middle District of Georgia because it resides within this District and Division.

## ADMINISTRATIVE PROCEEDINGS

9.     On July 21, 2011, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of Defendant's last discriminatory acts.  A true and correct copy of Plaintiff's EEOC charge is attached hereto as Exhibit A.

10.     On or about December 15, 2011, Plaintiff received from the EEOC a Notice of Suit Rights ("Right to Sue Letter") dated December 12, 2011, for his

Charge of Discrimination numbered 410-2011-04815.  A true and correct copy of the Right to Sue Letter is attached as Exhibit B.

## COUNT I: FAILURE TO PAY OVERTIME

11.     Defendant hired Plaintiff in December of 2004 for a position as an Equipment Operator.  Defendant subsequently promoted Plaintiff to the position of Lead Man.

12.     Throughout the time of Plaintiff's employment, Defendant paid him an hourly wage.

13.     Plaintiff was a full-time employee who almost always worked more than 40 hours per week.

14.     Defendant never paid Plaintiff on a salary basis.

15.     On March 28, 2008, Defendant increased Plaintiff's hourly rate of Pay from $13.40 to $15.00.

16.     On February 19, 2010, Defendant increased Plaintiff's hourly rate of pay from $15.00 to $15.25.

17.     On February 18, 2011, Defendant increased Plaintiff's hourly rate of pay from $15.25 to $15.50.

18.     According to Defendant, Plaintiff's scheduled work hours were to be from 6:00 a.m. until 5:00 p.m., with a 30 minute lunch break sometime during the day.

19.     On certain days, Plaintiff would drive his personal vehicle to the location where Defendant was conducting mining activities.   On other days, Plaintiff would drive his personal vehicle to Defendant's principal place of business, park his personal vehicle there, and then drive one of Defendant's trucks to the location where Defendant was conducting mining activities.

20.     Defendant required its employees to fill out their own timesheets.

21.     Defendant instructed Plaintiff to write "6:00 a.m." as his clock-in time and "5:00 p.m." as his clock-out time regardless of any daily variations in the actual times at which Plaintiff started and stopped working.

22.     Defendant calculated its employees' work hours by rounding the times marked on their timesheets to the nearest quarter hour.

23.     Defendant regularly deducted 30 minutes from Plaintiff's daily time on the assumption that Plaintiff took a lunch break of 30 minutes.

24.     However, Defendant's deduction of 30 minutes for lunch was improper because Plaintiff was required to remain at his jobsite during lunch, and he frequently performed work during his supposed lunch break.

5

25.     Moreover, on many days Plaintiff took no time for lunch and worked through the entire day without interruption.  On these days, Plaintiff would write "no lunch" on his timesheet.

26.     However, Defendant would frequently deduct 30 minutes from Plaintiff's time even on those days when Plaintiff wrote "no lunch" on his timesheet.

27.     Although Defendant required Plaintiff to mark "5:00 p.m." as his clock-out time on his timesheet, Plaintiff did not stop working at this time.  Instead, Plaintiff would frequently drive Defendant's truck from the jobsite to Defendant's principal place of business.  On some days, Plaintiff also fueled up and washed Defendant's truck.  However, Defendant never compensated Plaintiff for his work performed after 5:00 p.m., even though Defendant's benefitted from this work and knew that Plaintiff performed it.

28.     In addition, Plaintiff was required to spend an average of 15 to 20 minutes per day filling out work-related paperwork at his home for the benefit of Defendant.  Defendant knew that Plaintiff completed paperwork from home, but nevertheless refused to compensate him for this time.

29.     Defendant failed to maintain accurate records of Plaintiff's time by failing to record compensable time worked by Plaintiff (1) during his supposed

lunch break, (2) when he returned, fueled, and/or washed Defendant's truck, and (3) when Plaintiff completed paperwork from home. Defendant's failure to maintain accurate records of Plaintiff's time is an independent violation of the FLSA.

30.    Defendant's violations of the FLSA's overtime provision, 29 U.S.C. § 207(a), were willful because Defendant (1) failed to maintain accurate time records and (2) failed to compensate Plaintiff at all for the substantial time he worked during his supposed lunch break, after the end of his shift, and from his home.

31.    Pursuant to 29 U.S.C. §§ 216(b) and 255(a), Defendant is liable to Plaintiffs for three years of unpaid overtime wages, an equal amount as liquidated damages, and reasonable attorney's fees.

### FACTS IN SUPPORT OF PLAINTIFF'S CLAIMS FOR UNLAWFUL RACE DISCRIMINATION

32.    Plaintiff is an African American male.

33.    On information and belief, Defendant has approximately 100 employees.

34.    Defendant hired Plaintiff in December of 2004 for a position as an Equipment Operator. Defendant subsequently promoted Plaintiff to the position of Lead Man.

35.    During his employment with Defendant, Plaintiff was subjected to racist comments and adverse employment actions on account of his race on a regular basis.

36.    For example, Plaintiff had to work for Defendant for one year before being granted any vacation time.  Defendant first permitted Plaintiff to take a vacation in 2005.  However, Defendant gave similarly situated white employees two weeks of vacation time in the first year of their employment.

37.    By way of further example, Defendant docked Plaintiff's pay when Plaintiff arrived approximately 30 minutes late to work on or about Thursday, June 23, 2011, but did not dock the pay of similarly situated white employees who arrived late to work.

38.    By way of further example, Plaintiff once instructed a coworker named Craig Cox how to solve a work-related problem.  In response, Mr. Cox approached Plaintiff, put his finger on Plaintiff's nose, and shouted at him "you black folks think you know to do everything.  You can't tell this white man how to do this job."  Plaintiff reported Mr. Cox's statement to Ted Smith, the owner of Defendant, but Mr. Smith refused to take any disciplinary action against Mr. Cox.

39.    By way of further example, Mr. Cox once stated over the company radio that "y'all niggers are out there stealing tennis shoes."  Plaintiff complained

about Mr. Cox's language to Ted Smith, owner of Defendant.  However, Mr. Smith merely replied that "I know what you are dealing with; I am married to [Mr. Cox's] sister."

40.     By way of further example, Plaintiff once asked a coworker named Frank Bentley to perform a work-related task.  Mr. Bentley responded that "y'all niggers think you're smart just like y'all half-nigger president; ain't no nigger going to tell me what to do."

41.     Plaintiff reported this conduct and language to Rodney Price, Plaintiff's supervisor, who refused to discipline Mr. Bentley.  Instead, Mr. Price asked Plaintiff "what is a nigger?"

42.     Plaintiff also reported Mr. Bentley's use of the word "nigger" to Ted Smith.  However, instead of disciplining Mr. Bentley, Mr. Smith condoned Mr. Bentley's behavior by remarking to Plaintiff that "Frank is old-school."

43.     Mr. Bentley remains an employee of Defendant.

44.     By way of further example, on or about June 6, 2011, Plaintiff asked Mr. Cox to perform several tasks at Defendant's jobsite.  However, Mr. Cox refused to take instructions from Plaintiff.  Instead, Mr. Cox became visibly upset, and he stated to Plaintiff that "you just ignorant; you just plain ignorant."

45.    This incident caused Mr. Cox to become so angry and upset that he skipped work for approximately one week without excuse.

46.    Upon information and belief, Mr. Cox's racist views made him unable to tolerate taking instructions from black employees, such as Plaintiff.  Mr. Cox resented that Plaintiff was the Lead Man at the jobsite while Mr. Cox was merely an Equipment Operator.

47.    Upon information and belief, after the incident on or about June 6, 2011, Mr. Cox sought to have Plaintiff terminated or demoted on account of his race, and he used his family connections with Defendant's management to effectuate this goal.

48.    Defendant is a family-owned and operated business, and Ted Smith runs the company with the help of his two sons, Kevin Smith and Ashley Smith. Ted Smith's wife, and his sons' mother, is Mr. Cox's sister.  Therefore, Mr. Cox is Ted Smith's brother-in-law and is Kevin and Ashley Smith's uncle.

49.    When Plaintiff received his paycheck on or about Friday, June 24, 2011, he noticed that his hours did not add up to the correct amount.  Defendant had docked his hours by 30 minutes for "lunch" on a day when Plaintiff had worked through lunch.

50.    On Monday, June 27, 2011, Plaintiff's supervisor, Rodney Price, approached Plaintiff and inexplicably asked Plaintiff "are you threatening me; are you threatening me?"  Plaintiff responded that he was not threatening Mr. Price.

51.    Plaintiff did not threaten Mr. Price, nor has Plaintiff ever threatened anyone at work or engaged in any acts of violence or threatening conduct at work.

52.    In the conversation that ensued, Plaintiff complained to Mr. Price, about the fact that Defendant docked his pay by 30 minutes.  Mr. Price said that Kevin Smith, Ted Smith's son, wanted to fire Plaintiff for "stealing time" and for coming in late.

53.    Although Plaintiff had arrived 30 minutes late to work on or about Thursday, June 23, 2011, he worked through lunch to make up for his late arrival.

54.    Defendant permitted its employees to arrive up to 30 minutes late if they worked through lunch.  For example, on numerous occasion, Plaintiff's white co-worker Mr. Cox arrived late to work and was not disciplined by Defendant.

55.    On or about Tuesday, June 28, 2011, Mr. Price approached Plaintiff and handed him a disciplinary write-up citing Plaintiff for arriving late to work. During this conversation, Plaintiff complained to Mr. Price about the differential treatment to which Defendant subjected him in comparison with similarly situated white employees.  Mr. Price shouted "shut up and sign the papers."

56.    On or about Wednesday, June 29, 2011, Plaintiff noticed that his name was not on the work schedule at Defendant's place of business.  Kevin Smith approached Plaintiff and told him that Mr. Price had said that Plaintiff engaged in threatening behavior.  Ted Smith advised Plaintiff that, if he were Mr. Price, he would have called the sheriff.

57.    On or about Friday, July 1, 2011, Defendant terminated Plaintiff. During the meeting at Defendant's central office, Ted Smith stated that Plaintiff had been a great employee.  Ted Smith said that if Plaintiff agreed to resign, Defendant would give Plaintiff 4 weeks of pay.  Ted Smith also said that he would give Plaintiff a positive letter of recommendation.   Furthermore, Ted Smith admitted that he did not believe that Plaintiff threatened Mr. Price or anyone else. Kevin Smith also agreed that Plaintiff did not threaten Mr. Price.  Nevertheless, when Plaintiff refused to resign, Defendant terminated him.

58.    On or about Friday, July 1, 2011, Defendant terminated Plaintiff on account of his race and/or in retaliation for his decision to engage in activities protected under Title VII, Section 1981, and/or the FLSA.

## COUNT II: RACE DISCRIMINATION IN VIOLATION OF SECTION 1981

59.    Plaintiff adopts and incorporates by reference Paragraphs 32 through 58 of this Complaint.

12

60.    Defendant subjected Plaintiff to multiple adverse employment actions on the basis of his race including, but not limited to, his termination on or about July 1, 2011.

61.    Defendant's conduct in intentionally and knowingly taking, permitting, and/or allowing the tangible adverse employment actions against Plaintiff on the basis of his race was in violation of Section 1981.

62.    As a direct and proximate result of Defendant's conduct in intentionally and knowingly taking, permitting, and/or allowing the tangible adverse employment actions against Plaintiff on the basis of his race, Plaintiff has suffered and will continue to suffer loss of past and future income and employee benefits, mental anguish, emotional distress, humiliation, embarrassment, and other damages, and, therefore, Plaintiff is entitled to recover these damages from Defendant in an amount to be determined by a jury.

63.    Defendant intentionally and knowingly took, permitted, and/or allowed the tangible adverse employment actions against Plaintiff with reckless disregard or deliberate disregard for the rights and safety of Plaintiff.  As a result, Plaintiff is entitled to punitive damages against Defendant in an amount to be determined by a jury.

64.    Plaintiff is also entitled to attorney fees and costs incurred in connection with this claim.

## COUNT III: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

65.    Plaintiff adopts and incorporates by reference Paragraphs 32 through 58 of this Complaint.

66.    Defendant subjected Plaintiff to multiple adverse employment actions on the basis of his race including, but not limited to, his termination on or about July 1, 2011.

67.    Defendant's conduct in intentionally and knowingly taking, permitting, and/or allowing the tangible adverse employment actions against Plaintiff on the basis of his race was in violation of Title VII.

68.    As a direct and proximate result of Defendant's conduct in intentionally and knowingly taking, permitting, and/or allowing the tangible adverse employment actions against Plaintiff on the basis of his race, Plaintiff has suffered and will continue to suffer loss of past and future income and employee benefits, mental anguish, emotional distress, humiliation, embarrassment, and other damages, and, therefore, Plaintiff is entitled to recover these damages from Defendant in an amount to be determined by a jury.

69.    Plaintiff is also entitled to attorney fees and costs incurred in connection with this claim.

## FACTS IN SUPPORT OF PLAINTIFF'S CLAIM
## FOR UNLAWFUL WAGE DISCRIMINATION

70.    Defendant paid similarly situated non-African American (i.e., white) employees higher wages than Plaintiff for performing the same or fewer duties as Plaintiff.

71.    For example, Defendant paid $14.50 per hour to a newly-hired employee named Dennis Bachelor when he started working for Defendant in 2007. At this time, Plaintiff was a Lead Man, and Mr. Bachelor was an Equipment Operator on Plaintiff's crew.   However, Defendant paid Plaintiff approximately $12.85 per hour.

72.    Defendant has instructed Plaintiff on multiple occasions that all information concerning compensation must be kept confidential.

73.    Defendant repeatedly made deductions from Plaintiff's wages and compensable work hours, but it did not take these same deductions from similarly situated non-African American (i.e., white) employees' wages and hours. Consequently, Defendant paid Plaintiff paid even less than similarly situated non-African American (i.e., white) employees.

## COUNT IV: WAGE DISCRIMINATION
## IN VIOLATION OF SECTION 1981

74.     Plaintiff adopts and incorporates by reference Paragraphs 70 through 73 of this Complaint.

75.     Defendant's wage discrimination against Plaintiff on the basis of his race was in violation of Section 1981.

76.     As a direct and proximate result of Defendant's intentional wage discrimination against Plaintiff on the basis of his race, Plaintiff has suffered and will continue to suffer loss of past and future income and employee benefits, mental anguish, emotional distress, humiliation, embarrassment, and other damages, and, therefore, Plaintiff is entitled to recover these damages from Defendant in an amount to be determined by a jury.

77.     Defendant discriminated against Plaintiff on the basis of his race by paying him lower wages than similarly situated white employees with reckless disregard or deliberate disregard for Plaintiff's rights.   As a result, Plaintiff is entitled to punitive damages against Defendant in an amount to be determined by a jury.

78.     Plaintiff is also entitled to attorney fees and costs incurred in connection with this claim.

## COUNT V: WAGE DISCRIMINATION IN VIOLATION OF TITLE VII

79.     Plaintiff adopts and incorporates by reference Paragraphs 70 through 73 of this Complaint.

80.     Defendant's wage discrimination against Plaintiff on the basis of his race was in violation of Title VII.

81.     As a direct and proximate result of Defendant's intentional wage discrimination against Plaintiff on the basis of his race, Plaintiff has suffered and will continue to suffer loss of past and future income and employee benefits, mental anguish, emotional distress, humiliation, embarrassment, and other damages, and, therefore, Plaintiff is entitled to recover these damages from Defendant  and in an amount to be determined by a jury.

82.     Plaintiff is also entitled to attorney fees and costs incurred in connection with this claim.

## FACTS IN SUPPORT OF NAMED PLAINTIFF'S RETALIATION CLAIM

83.     On one occasion, Plaintiff's coworker Craig Cox approached Plaintiff, put his finger on Plaintiff's nose, and shouted at him "you black folks think you know to do everything.  You can't tell this white man how to do this job."  Plaintiff engaged in protected activity under Title VII and Section 1981 by reporting Mr. Cox's statement to Ted Smith, the owner of Defendant.

84.    On one occasion, Mr. Cox stated over the company radio that "y'all niggers are out there stealing tennis shoes."  Plaintiff engaged in protected activity under Title VII and Section 1981 when he reported this conduct to Ted Smith, owner of Defendant.

85.    On one occasion, Plaintiff's coworker Frank Bentley stated to Plaintiff that "y'all niggers think you're smart just like y'all half-nigger president; ain't no nigger going to tell me what to do."  Plaintiff engaged in protected activity under Title VII and Section 1981 when he reported this conduct to Rodney Price, Plaintiff's supervisor and to Ted Smith.

86.    On Monday, June 27, 2011, Plaintiff approached his supervisor Rodney Price and filed an oral complaint regarding Defendant's failure to pay him for all hours that he worked in the previous payperiod.  Plaintiff also complained to Mr. Price about the differential treatment to which Defendant subjected him in comparison with similarly situated white employees.  When Plaintiff submitted these complaints to Mr. Price, he engaged in conduct protected under Title VII, the FLSA, and Section 1981.

87.    On Friday, July 1, 2011, Defendant terminated Plaintiff on account of his race and/or in retaliation for his activities protected under Title VII, Section 1981, and/or the FLSA.

## COUNT VI: RETALIATION IN VIOLATION OF SECTION 1981

88.     Plaintiff adopts and incorporates by reference Paragraphs 83 through 87 of this Complaint.

89.     Though Defendant did not have a formal reporting mechanism, Plaintiff repeatedly reported to Defendant that he was subjected to discriminatory treatment on account of his race.

90.     Plaintiff's reports constituted statutorily protected conduct under Section 1981.

91.     As punishment and retribution for engaging in statutorily Protected conduct, Plaintiff suffered numerous adverse employment actions and other actions by Defendant that were aimed at dissuading Plaintiff from engaging in statutorily protected conduct, including but not limited to Defendant's termination of Plaintiff on July 1, 2011.

92.     The adverse employment actions and other actions aimed at dissuading Plaintiff from engaging in statutorily protected expressions were directly and proximately causally related to Plaintiff's protected expressions, as evidenced by, among other things, the temporal proximity between Plaintiff engaging in the protected expression and the retaliatory action.

93.     Defendant's retaliation against Plaintiff was in violation of Section 1981.

94.     As a direct and proximate result of Defendant's retaliation against Plaintiff for engaging in statutorily protected opposition to Defendant's intentionally racially discriminatory business practices, Plaintiff has suffered and will continue to suffer loss of past and future income and employee benefits, mental anguish, emotional distress, humiliation, embarrassment, and other damages, and, therefore, Plaintiff is entitled to recover these damages from Defendant in an amount to be determined by a jury.

95.     Defendant retaliated against Plaintiff for engaging in statutorily protected opposition to Defendant's intentionally racially discriminatory business practices with reckless disregard or deliberate disregard for the rights and safety of Plaintiff.  As a result, Plaintiff is entitled to punitive damages against Defendant in an amount to be determined by a jury.

96.     Plaintiff is also entitled to attorney fees and costs incurred in connection with this claim.

## COUNT VII: RETALIATION IN VIOLATION OF TITLE VII

97.     Plaintiff adopts and incorporates by reference Paragraphs 83 through 87 of this Complaint.

98.   Though Defendant did not have a formal reporting mechanism, Plaintiff repeatedly reported to Defendant that he was subjected to discriminatory treatment on account of his race.

99.   Plaintiff's reports constituted statutorily protected conduct under Title VII.

100.   As punishment and retribution for engaging in statutorily Protected conduct, Plaintiff suffered numerous adverse employment actions and other actions by Defendant that were aimed at dissuading Plaintiff from engaging in statutorily protected conduct, including but not limited to Defendant's termination of Plaintiff on July 1, 2011.

101.   The adverse employment actions and other actions aimed at dissuading Plaintiff from engaging in statutorily protected expressions were directly and proximately causally related to Plaintiff's protected expressions, as evidenced by, among other things, the temporal proximity between Plaintiff engaging in the protected expression and the retaliatory action.

102.   Defendant's retaliation against Plaintiff was in violation of Title VII.

103.   As a direct and proximate result of Defendant's retaliation against Plaintiff for engaging in statutorily protected opposition to Defendant's intentionally racially discriminatory business practices, Plaintiff has suffered and

will continue to suffer loss of past and future income and employee benefits, mental anguish, emotional distress, humiliation, embarrassment, and other damages, and, therefore, Plaintiff is entitled to recover these damages from Defendant in an amount to be determined by a jury.

104.  Plaintiff is also entitled to attorney fees and costs incurred in connection with this claim.

## COUNT VIII: RETALIATION IN VIOLATION OF TITLE VII

105.   Plaintiff adopts and incorporates by reference Paragraphs 83 through 87 of this Complaint.

106.   Though Defendant did not have a formal reporting mechanism, Plaintiff submitted oral complaints to Defendant regarding Defendant's failure to pay him for all hours worked.

107.   Plaintiff's reports constituted statutorily protected conduct under the FLSA.

108.   As punishment and retribution for engaging in statutorily Protected conduct, Plaintiff suffered numerous adverse employment and other actions by Defendant that were aimed at dissuading Plaintiff from engaging in statutorily protected conduct, including but not limited to Defendant's termination of Plaintiff on July 1, 2011.

109.   The adverse employment actions and other actions aimed at dissuading Plaintiff from engaging in statutorily protected expressions were directly and proximately causally related to Plaintiff's protected expressions, as evidenced by, among other things, the temporal proximity between Plaintiff engaging in the protected expression and the retaliatory action.

110.   Defendant's retaliation against Plaintiff was in violation of the FLSA.

111.   As a direct and proximate result of Defendant's retaliation against Plaintiff for engaging in statutorily protected opposition to Defendant's violations of the FLSA, Plaintiff has suffered and will continue to suffer loss of past and future income and employee benefits, mental anguish, emotional distress, humiliation, embarrassment, and other damages, and, therefore, Plaintiff is entitled to recover these damages from Defendant in an amount to be determined by a jury.

112.   Plaintiff is also entitled to attorney fees, liquidated damages, and costs incurred in connection with this claim.

## **PRAYER FOR RELIEF**

Based on the allegations set forth in this Complaint and the evidence as it is developed in this case, Plaintiff respectfully prays that:

- the Court enter judgment in favor of Plaintiff as to each of Plaintiff's claims;

- the Court award Plaintiff compensatory damages, punitive damages, liquidated damages, and any and all other damages as provided under the law and as requested in each of Plaintiff's claims;

- the Court award Plaintiff his attorney fees and litigation costs as provided under the law and as requested in each of Plaintiff's claims; and

- the Court grant Plaintiff all other further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated:        March 05, 2012

                                                    Respectfully submitted,


                                                    s/ Jeff Kerr

**MAYS & KERR LLC**                                 Jeff Kerr
229 Peachtree Street NE                             Ga. Bar No. 634260
International Tower | Suite 980                      jeff@maysandkerr.com
Atlanta, Georgia 30303
Telephone:   404 410 7998                           John L. Mays
Facsimile:   404 855 4066                           Ga. Bar No. 986574
Attorneys for Plaintiff                             john@maysandkerr.com